IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANNABELLE HERRERA,

        Plaintiff,

vs.                                  No.  03cv1093  DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's (Herrera's) Motion to Reverse or Remand Administrative Agency Decision [**Doc. No. 10**], filed February 24, 2004, and fully briefed on April 13, 2004.  On April 14, 2003, the Commissioner of Social Security issued a final decision denying Herrera's claim for disability insurance benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand for a rehearing is well taken and will be GRANTED.

### I.  Factual and Procedural Background

Herrera, now sixty-one years old, protectively filed her application for disability insurance benefits on February 5, 2001, alleging disability since November 9, 2000, due to back, hip and knee pain.  Tr. 113.  Herrera has a high school education and past relevant work as a medical assistant and phlebotomist.  Tr. 119.  On March 25, 2003, the Commissioner's Administrative Law Judge (ALJ) held a hearing.  Tr. 231-246.  On April 14, 2003, the ALJ issued his unfavorable decision, finding Herrera's degenerative disc disease was a severe impairment but not

severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  Tr. 18.  The ALJ further found Herrera retained the residual functional capacity (RFC) to perform light work and thus could perform her past relevant work.  Tr. 19. Herrera filed a Request for Review of the decision by the Appeals Council.  On September 2, 2003, the Appeals Council denied Herrera's request for review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Herrera seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while

2

the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

Additionally, the Commissioner faces a more stringent burden when denying disability benefits to older claimants. *Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).

In support of her motion to reverse, Herrera makes the following arguments: (1) the ALJ's RFC determination is not supported by substantial evidence and is contrary to the law; and (2) the ALJ's determination that she could perform her past relevant work is unsupported by substantial evidence and legally erroneous; (3) the ALJ failed to properly consider medical opinion evidence; and (4) the ALJ's credibility determination is unsupported by substantial evidence and legally erroneous.

## A. Medical Records– April 21, 1998 Through January27, 2003

On **April 21, 1998**, Dr. McCormick, Herrera's primary care physician, ordered x-rays, specifically, "Five View lumbar spine with obliques." Tr. 191. The results indicated Herrera had "minimal narrowing at L5-S1." *Id*. An MRI was recommended.

On **June 30, 1999**, P. Langham Gleason, M.D., a neurologist with Neurological Surgery Associates of Northern New Mexico, evaluated Herrera. Tr. 150. On that day, Herrera presented with complaints of back and bilateral leg pain. Herrera described the pain as constant and claimed it radiated into her legs, bilaterally. The pain was worse when she was lying in bed. Additionally, Herrera reported leg cramps at night and numbness in her toes. Herrera was taking Tylenol and Aleve for her pain with only mild relief. Dr. Gleason's physical examination indicated the following:

> Physical Exam: Medium build, middle age female in mild to moderate discomfort. Back exam: there is marked bilateral paraspinal muscle spasm. There is tenderness over the sciatic notch bilaterally. Straight leg raise sign is positive on the right and left sides without a cross straight leg sign. Range of motion is normal in flexion. Extension is limited essentially to the neutral position by pain. Lateral flexion is pain free. Motor exam: there is full strength throughout in detail, except for some mild giveaway weakness

in the quadriceps.  <u>Sensory exam:</u>  pinprick sensation is intact over the distal lower extremities and lateral thigh and calf.  <u>Reflexes:</u>  2+ throughout.  <u>Gait:</u>  normal including tiptoe and heel walking.

<u>Impression:</u>  56 year old woman with a longstanding low back pain due to an old lifting injury at work without radicular signs on exam.

<u>Plan:</u>  She will undergo an MRI scan to look at the lumbar spine.  She will try Flexeril as a muscle relaxant and Naprosyn 500 mg b.i.d. as an anti-inflammatory.  I will see her back in follow-up after the MRI scan.

Tr. 149-150.

On **July 23, 1999**, Dr. Gleason ordered a Lumbar MRI without contrast and x-rays of the

lumbar spine.  Tr. 175-177.  The MRI results indicated the following:

<u>IMPRESSION:</u>
1. No evidence of focal disc extrusion or severe canal nor neuroforaminal compromise.
2. Diminished signal and mild disc space narrowing at L3-4 and to a lesser extent, L2-3 and L4-5.  This assumes the last fully formed disc space is L5-S1.  There may well be transitional S1 vertebral body present.
3. L5-S1 broad disc which mildly indents the thecal sac anteriorly and perhaps minimally obscures the S1 nerve roots, left greater than right.  There may well be  a subtle annular fissure posteriorly at the midline.
4. Mild broad disc at L4-5 with minimal extension off to the left.  Moreover, there is bilateral ligamentum flavum hypertrophy and minimal facet arthropathy.

Tr. 177.  Results of the lumbar spine x-rays indicated the following:

<u>Findings:</u>
Five view LS spine demonstrates some gentle levoscoliosis which may be positional.  There appears to be attempt to lumbarization of S1.  there are, however, essentially five non-rib bearing lumbar segments.  Alignment is anatomic.  The vertebral body height and disc space is relatively well maintained.  There is no evidence of spondylolysis.  There is some asymmetry of the SI (sacroiliac) joints but no acute abnormality.  Hips are unremarkable.  Question of pheboliths are noted within the pelvis.  There is a calcification projecting over the left psoas laterally which most likely is incidental.
1.      Anatomic alignment.
2.      <u>No evidence of spondylolysis nor listhesis.</u>

Tr. 173.

On **July 29, 1999**, Herrera returned to see Dr. Gleason.  Tr. 202.  Herrera reported her pain "was a little bit improved"on the Flexeril and Naprosyn.  Herrera rated her pain "as 90% in the low back and 10% in her legs."  *Id.*  Dr. Gleason noted "the MRI results indicated a mild left sided disc bulge at L5-S1 compromising the exiting L5 nerve root <u>slightly perhaps</u>."  *Id.* (emphasis added).  Dr. Gleason also noted "very mild spinal stenosis at L4-5 due to a small disc bulge and <u>facet hypertrophy</u>."  *Id*. (emphasis added).  As to the x-ray results, Dr. Gleason noted "plain x-rays of the lumbar spine are unremarkable other than a <u>very, very mild retrolisthesis of L5 on S1</u>."  *Id.* (emphasis added).  Dr. Gleason advised Herrera to continue the Naprosyn and Flexeril.  Dr. Gleason prescribed a course of physical therapy and directed her to return in six weeks.

On **September 16, 1999**, Herrera returned for her six week follow-up.  Tr. 202.  Herrera reported "that while physical therapy, Flexeril and Naprosyn [had] afforded her relief of her discomfort, she continue[d] to experience daily and persistent lower back pain."  *Id.*  Her lower extremities were "bothersome," but her main complaint centered around her lower back.

On **October 15, 1999**, Dr. Hinds, an orthopedic surgeon, diagnosed Herrera with (1) mechanical low back pain with <u>facet arthropathy</u> and (2) possible degenerative disk disease with pressure on the S1 nerve root.  Tr. 172.  On that day, Dr. Hinds administered bilateral facet injections at L4-5, L5-S1.  Dr. Hinds noted:

> <u>HISTORY OF THE PRESENT ILLNESS:</u>
> This is a 56-year old lady who has been having low back pain since 1980 increasing each year.  Occasionally she has radiation into the posterior thighs and calves and some numbness of the big toe on the left.  That is not constant.  Twisting increases the pain.  Today, on a scale of 0 to 10 the pain is an 8.  She works at Tricor Labs and continues to work full-time.  After she comes home from work her pain is much worse.  She denies any marked weakness or any inciting incident.
> <u>IMAGING STUDIES</u>:

6

An MRI was done on 07/23/99. It did not show any evidence of frank herniation or stenosis, transitional S1, L5-S1, mild disc with possible pressing on the thecal sac on the S1 nerve root.

PHYSICAL EXAMINATION:
On physical examination her gait is within normal limits. She can heel and toe walk well. Flexion at the waist at 45 degrees precipitates pain. Extension has questionable pain at 15 degrees. Motor is 5/5. Sensory seems to be intact to soft touch and pinprick with the exception of the dorsum of the left toe, there seems to be some decreased sensation over the left toe. Straight leg raising is negative. There is tenderness to palpation paraspinally in the lower lumbar area.

The diagnosis is most likely mechanical low back pain. The plan today is to do bilateral facet injections L4-5 and L5-S1. Risks, procedure, and benefits were discussed with the patient and her husband and they consented to the procedure.

Procedure:
A #20 Angiocath was started in the right upper extremity. She was taken to the C-arm room and placed prone. She was given 2 mg of Versed and 50 mcg of fentanyl. Noninvasive monitoring was used. Obliqueing the image intensifier the L4-5 and the L5-S1 facets were identified bilaterally. Local anesthetic was placed with a 30 gauge needle. Then down the beam of the C-arm using a 3 inch 22 gauge needle, it was placed in the facets in all four facets and 1.5 cc of 0.25 % Marcaine (anesthetic) with 50 mg of Depo-Medrol (steroid) was placed in each facet. The patient tolerated the procedure well. She will be followed by the pain center in three to five days to see if this has been helpful to her. Another possible diagnosis could be some discogenic disease placing some pressure on nerve roots causing some intermittent radiculopathy.

Tr. 172-174.

On **March 21, 2000**, Dr. Gleason ordered x-rays of the lumbar spine and a whole body

bone scan. Tr. 170-171. The radiologist compared the results to an MRI dated July 23, 1999.

Tr. 170. The radiologist noted:

FINDINGS:
On the plain films, there is evidence of some bony sclerosis involving the fact joints at L3, L4, and L5. Films labeled "flexion" and "extension" demonstrated minimal, if any retrolisthesis of L5 on S1 during extension. No other evidence of spondylolisthesis. There are some osteoarthritic changes, including some end plate sclerosis most notable at L1-L2.

On the bone scan, on the planar images, there is a focus of increased uptake on the right, probably involving the L4 vertebra along the facet and pedicle. There is also some increased uptake at the level of the vertebral body along with a facet joint just above this, probably at L3.

IMPRESSION:
Abnormal uptake on the right and lower lumbar spine, likely involving the posterior
elements, probably along the facet joint at either the L3-L4 or L4-L5 level.  This does
correspond to some bony sclerosis as seen on the plain films, suggesting <u>facet arthropathy</u>.

Tr. 170-171 (emphasis added).

On **April 5, 2000**, Dr. Paul Fullerton, D.O., <u>administered a lumbar facet injections</u> at St.

Vincent Hospital.  Tr. 168-169.  Dr. Fullerton noted:

CLINICAL HISTORY:
This is a 57 year old female returning to the pain clinic for lumbar facet injections.  Her
primary physician referring the patient for the procedure is Dr. Gleason.  She has
undergone facet injections in the past in the clinic by Dr. Hinds on 10/15/99.  She states
that following the injections she had good relief for several months until approximately one
month ago when she began developing return of her back pain and bilateral lower leg
anterior pain extending to the knee.  She is continuing to take Flexeril and Celebrex for this
complaint.  Her previous medical history is well-outlined in the previous dictation.  There
have been no interval changes.  I discussed with her the procedure, risks and
complications, and she agreed to proceed.

PROCEDURE:
The patient was taken to x-ray and placed in a prone position.  At L4-5 the lumbar spine
was prepped with Betadine and from an oblique imaging L4-5 and L5-S1 facets on both
sides were identified and entered with a 22 gauge needle.  She received a total of 80 of
Depo-Medrol (steroid) in 6 cc of 0.25 % Marcaine (anesthetic) distributed throughout the
four sites.  She stated on discharge she had relief of her pain.  She will be followed up in
the pain clinic in one week by phone and a scheduled with Dr. Gleason.

Tr. 168-169.

On **May 12, 2000**, Paul Fullerton, D.O., <u>administered a lumbar epidural steroid injection</u>

at St. Vincent Hospital.  Tr. 166-167.  Dr. Fullerton noted:

CLINICAL HISTORY:
This is a 57 year old female referred to the clinic by Dr. Gleason for a lumbar epidural
steroid injection.  The patient has undergone facet injections in the past through the clinic
and states that she had some improvement in her back pain, however, she is currently
complaining primarily of radiating pain into her left leg.  She states that the pain seems to
be worse at night when she is trying to sleep.  She has had an MRI of her lumbar spine and
has been evaluated by Dr. Gleason in the interim and was felt to have a disc bulge at L5-
S1 and L4-5, that is primarily left-sided.

PAST MEDICAL HISTORY:

Her past medical history is outlined in her previous dictations.  There have been no interval changes. She is currently taking estrogen patch, a muscle relaxant, an anti-inflammatory, and Claritin.  Her allergies include primarily environment.  She has no know drug allergies.

PROCEDURE:
The patient was taken to x-ray and placed prone.  She was given 2 mg of Versed for relaxation.  The area over the lumbar spine was prepped and draped in the usual fashion.  1% lidocaine (anesthetic) was locally infiltrated at the L5-S1 level slightly left of midline.  The epidural space was entered easily on first pass with a distinct loss of resistance.  Omnipague 240 (imaging enhancing product) was injected showing epidural spread, both anterior and posterior.  She received 80 mg of Depo-Medrol in 6 cc of 0.5% lidocaine without preservative.  She tolerated the procedure well and was discharged in good condition.  She will be followed up by Dr. Gleason.

Tr. 166-167.

On **June 21, 2000**, Paul Fullerton, D.O., <u>administered a lumbar epidural steroid injection</u>

at St. Vincent Hospital.  Tr. 164-165.  Dr. Fullerton noted:

CLINICAL HISTORY:
This is a 57 year old female, well-known to the pain clinic, and referred to the clinic by Dr. Gleason.  She has had two previous facet injections performed and an epidural steroid injection which she states gave her the most significant benefit.  She returns to the clinic today for a repeat epidural steroid injection.  Overall, she is continuing to do better than she was prior to the injections, although her pain is beginning to return.  Her pain is primarily radiating pain into her legs, left more so than right.  She describes some anterior thigh pain as well.

PROCEDURE:
The patient was taken to x-ray and placed prone.  The area over the lumber spine was prepped and draped in the usual fashion.  1% lidocaine (anesthetic) was locally infiltrated at L5-S1 slightly left of midline.  The space was entered easily.  She received Omnipague (imaging enhancing product) 240 showing epidural spread followed by 80 mg of Depo-Medrol (steroid)  in 7 cc of 0.125% Marcaine (anesthetic).  She was discharged with improvement of her discomfort and will be followed up in the clinic in one week by phone and is scheduled with Dr. Gleason.

Tr. 164-165.

On **September 8, 2000**, Dr. Gleason ordered an MRI of the lumbar spine without

contrast.  Tr. 162.  The results were as follows:

IMPRESSION:  No significant interval change from the prior study.  <u>Minimal degenerative changes</u> at all levels as described.

There are five lumbar type vertebrae seen with an apparent sacralized segment.  Similar counting intervertebral bodies was performed on the previous study.  The conus is identified opposite the inferior L1 level.

Bulging annuli are identified at the L1-2, L2-3, L3-4, L4-5 and L5-6 levels.  No significant thecal sac effacement is seen.  There is mild hypertrophy of the ligamentum flavum at the L4-5 level.  <u>No nerve root effacement is seen.</u>
There is preservation of normal vertebral body medullary signal at all levels except for a small posterior hemangioma in the L2 vertebral body superiorly.  This is noted on the prior study.

Tr. 162 (emphasis added).

On **September 28, 2000**, Dr. Gleason ordered a CT of the lumbar spine and a myelogram of the lumbar spine.  Tr. 157-161.  A lumbar myelogram is the common study for herniated nucleus pulposus or intervertebral disc protrusion.  *Stedman's Medical Dictionary* 1165 (26th ed. 1995).  The results of these studies are as follow:

IMPRESSION:  The patient does not look to have a very capacious central neural canal at L2 through L5.  Below, beginning at L5 and below, the sac is very large and sequesters a great deal of contrast.  The contrast is a bit dilute at levels above, but there is good visualization with patient placed in a more prone position rather than just upright for many of the views.  Mild to moderate ventral sac compressions are seen at L2 through L5 from disc bulges or small protrusions, <u>without any nerve root sleeve impingement evident</u>.

POST MYELOGRAPHIC CT:
IMPRESSION:  Although the thecal sac is a little small, very slightly constricted at L3 through L5 levels, <u>there is not a frank spinal stenosis</u>.  There is small left lateral disc protrusion at L2-L3, small left lateral disc protrusion at L3-L4, moderate sized right anterolateral disc protrusion with caudad extrusion at L3-L4, and small bilateral disc protrusions at L4-L5.  <u>None of these are particularly convincing for any definite neural compression</u>.

Tr. 160-161.

On **October 5, 2000**, Dr. McCormick referred Herrera to Joseph M. Smith, M.D., for a surgical consultation regarding a possible recurrent left inguinal hernia.  Tr. 205.  Dr. Smith

examined Herrera and found no evidence of a recurrent inguinal hernia.  Dr. Smith discussed the

signs and symptoms of recurrent hernia and advised her to return if she noted any of these signs

and symptoms.

On **December 1, 2000**, Dr. Hinds evaluated Herrera at Dr. Gleason's request.  Tr. 156.

Dr. Hinds diagnosed Herrera with low back pain and some buttocks pain.  Dr. Hinds noted

Herrera had two epidural blocks by Dr. Fullerton and one facet injection of the lumbar area on

**April 15, 2000**.  Dr. Hinds also noted, "An MRI does show broad-based disc L5-S1.  CT and

myelogram showed mild disc protrusion L4-5.  She was reevaluated and has been on Neurontin,

nortriptyline, and Vioxx, and is 20% improved, although the Vioxx causes her some gastric upset,

so I am asking her to discontinue the Vioxx."  *Id.*  Dr. Hinds opined Herrera suffered from

"mechanical low back pain or interdiscal disc disruption."  Dr. Hinds suggested she have a "repeat

of the facets and at the same time consider an S1 selective nerve root."  *Id.*

On **December 28, 2000**, Dr. Hinds treated Herrera.  Tr. 153-155.  Dr. Hinds administered

"SI injections bilaterally and lumbar facets L5-S1 and L4-5."  Tr. 153.  Dr. Hinds noted Herrera

had two epidural blocks and a facet injection administered by Dr. Fullerton in 2000, "none of

which significantly relieved her pain."  *Id.*  However, Dr. Hinds noted that Dr. Fullerton had

reported  that the October 15, 1999 facet injections Dr. Hinds administered significantly alleviated

her discomfort for several months. Dr. Fullerton noted the July 23, 1999 MRI showed no frank

stenosis or herniation, but it did show a bulging disc L5-S1."  Tr. 154.

Dr. Hinds performed a physical examination that indicated a normal gait, an ability to heel

and toe walk well, flexion at the waist at about 45 degrees precipitated pain, extension at about 15

degrees precipitated pain, motor was 5/5, sensory was intact to soft touch and pinprick, and

Herrera was tender over both SI joints to palpation. *Id.*

Dr. Hinds opined the "pain generator" was either <u>facet arthropathy and SI arthropathy</u> or

interdiscal disc disruption. Noting that facet injections "down-regulated" her pain for a significant

length of time in the past, Dr. Hinds recommended and administered facet and SI joint injections.

Tr. 154-155. Dr. Hinds noted:

<u>Procedure</u>:

> A #20 angiocath (an IV catheter) was started in the right upper extremity. The patient was
> given 2 mg of Versed (used for sedation) and 1 cc of Sublimaze (potent narcotic analgesic
> supplement in general or regional anesthesia). The SI (sacroiliac) joints were brought into
> view. Local anesthetic was placed in each place with a 30 gauge needle. Then using a 3
> inch 22 gauge needle it was placed down into the SI joint. One-eighth cc of dye in each
> location demonstrated intraarticular flow and 2 cc of solution with 0.25 % Marcaine (long-
> acting local anesthetic used for acute pain management) with 20 mg of Depo-Medrol
> (steroid) was placed in each location. Then the facets L5-S1 and L4-5 were identified by
> obliqueing the image intensifier and the same procedure was performed with local
> anesthetic with a 30 gauge needle and using 3 inch 22 gauge needles into each facet, dye
> demonstrating Depo-Medrol was placed bilaterally in the L4-5 and L5-S1 facets. The plan
> will be to follow the patient to determine if this has been helpful and if this is not
> particularly helpful, some consideration might be given to discography.

Tr. 155.

On **January 26, 2001**, Dr. Hinds reevaluated Herrera. Tr. 152. Dr. Hinds noted, "Two

epidural blocks in mid year 2000 by Dr. Fullerton did not alleviate her pain even though she had

an MRI that showed L5-S1 bulging discs. Facets done on 12/28/00 have significantly decreased

her pain along with Neurontin 100 mg three times a day and nortriptyline 10 mg at night." *Id.*

Dr. Hinds opined Herrera's "<u>part of the pain generator here is the facet arthropathy from</u>

<u>mechanical low back pain</u>." *Id.* (emphasis added).

On **February 5, 2001**, Herrera returned to see Dr. Lundgren and reported she had pain in her right elbow.  Tr. 243.  Herrera reported having discomfort at night in her right elbow the past two nights as opposed to pain 24/7.  Dr. Lundgren noted some point tenderness over the [right] lateral epicondyle.  Dr. Lundgren assessed Herrera with "[right] lateral epicondyle, responding." *Id.*  Dr. Lundgren treated Herrera with acupuncture.

On **February 8, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 243.  Herrera reported having right elbow pain since October 2000 after a stressful day at work as a phlebotomist.  Herrera reported the pain was continuous, 24/7, even at rest.  Herrera described the pain as an 8 on a scale of 10 with radiation down to the dorsal wrist and back to the shoulder.  Herrera reported she could not sleep due to the pain.  Dr. Lundgren examined Herrera and noted "right lateral epicondyle was tender to palpation, abduction in her right arm was limited, and there was tenderness to palpation at C5-6-7 interspaces, S19, and Th 14 and 15.  Resisted supination and wrist dorsiflexion reproduced the pain."  *Id.*  Dr. Lundgren's differential diagnosis was "cervical myelopathy vs. lateral epcondylitis."  *Id.*  Dr. Lungren treated Herrera with acupuncture.  After treatment, Herrera reported she was able to move her elbow without pain.

On **February 22, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 243.  Herrera reported her right arm and elbow were better.  Herrera reported she was actually pain free even when she moved her elbow rather than just at rest.  She reported being able to do everything "except make tortillas."  *Id.*  Dr. Lundgren treated Herrera with acupuncture.

On **March 7, 2001**, Herrera rescheduled her appointment to March 14.  Tr. 244.  At that time, Herrera reported she was about 80% improved.

On **March 15, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 244.  Herrera reported

being "pain free x 1 week, except at certain positions at night."  *Id.*  However, Herrera was still

80% improved.  Herrera reported she made tortillas and cleaned the bathroom but suffered pain

afterwards.  Dr. Lundgren noted a tender right lateral epicondyle with palpation and with resisted

extension.  Dr. Lundgren treated Herrera with acupuncture.

On **March 28, 2001**, Belyn Schwartz, M.D., Fellow of the American Academy of Physical

Medicine and Rehabilitation, evaluated Herrera.  Tr. 180-181.  Dr. Schwartz' medical notes, in

part, are as follow:

> Ms. Varela[1] is a 58-year old, right hand dominant female who is <u>referred by Dr. Gleason
> for pain management and evaluation of disability</u>.  The patient states that her pain in her
> low back dates back to 1983 when she was involved in a work related lifting injury while
> lifting a 40 lb to 50 lb tub of ice cream.  She states that at the time she had x-rays and
> physical therapy.  Over the years her pain progressed, though she has been able to continue
> work.  In 11/00 she did stop working stating that the pain was just too severe.  She has
> also had an episode of severe pain such that she had such difficulty even lifting her foot or
> cleaning her bottom.  She has been followed by doctors Gleason and Hinds and Fullerton.
>
> Her workup has included:
>
> 1.  Low back complete five view spine x-rays, 07/23/99 which revealed    anatomic
> alignment and no evidence of spondylolysis.
>
> 2.  MRI of the lumbar spine, 07/23/99 which revealed no evidence of focal disc
> extrusion or severe canal or neuro foraminal compromise.  There was some
> degenerative changes at L2-3, L3-4, and L4-5.  There was a mild broad-based disc at L5,
> S1 which mildly indented the thecal sac, as well as one at L4-5.  She had a whole body
> bone scan 03/21/00 which revealed findings suggesting facet arthropathy in the posterior
> elements of the lumbar spine, probably L3-4 or L4-5.
>
> 3.  Repeat MRI scan of the lumbar spine, 09/08/00 which no significant interval   change
> from the prior study.

---

[1] Herrera was married to Billie Varela until he died on July 1, 1997.  Herrera married
Freddie Herrera on June 24, 1999.  Therefore, some of Herrera's medical records refer to her as
Ms. Varela.  Tr. 100.

4.  She had a myelographic CT scan of the lumbar spine, 09/29/00 which revealed no frank spinal stenosis.  The patient has undergone physical therapy. She has also undergone injections including bilateral facet joint injections at L4-5 and L5, S1on 10/15/99, lumbar facet injections on 04/05/00, lumbar epidural steroid injection on 05/12/00, lumbar epidural injection on 06/21/00, and SI joint injections bilaterally and lumbar facet joint injections L5, S1 and L4-5 on    2/28/00.  Despite this she has continued to have pain. She has tried Vioxx which upsets her stomach.  She is currently taking Nortriptyline and Neurontin, and muscle relaxants.  All do not significantly change her pain.  She comes now complaining of constant low back pain that at times will wake her      up and when she does wake up she feels achy, she has trouble sleeping.  It increases when she is lying down, walking or sitting.  Nothing seems to really help her pain.  She occasionally has had numbness and tingling in her lower extremities.  She denies weakness or bowel or bladder problems.

PHYSICAL EXAMINATION:
Reveals Ms. Varela to be a pleasant female who is in no acute distress.  Evaluation of her posture reveals her shoulders and pelvis to be symmetric.  She is able to heel and toe walk, and squat and rise from a squatted position, though with rising she complained of low back pain.  She is able to flex forward such that her fingertips are about halfway from her knees to the floor.  With flexing backwards, however, she did complain of fairly severe pain. With extension and rotation she also had back pain worse to the left.  She had full strength in all lower extremity muscle groups, intact sensation, and symmetric reflexes.  Straight leg raises are to 80 degrees bilaterally.  Flexion, abduction, external rotation is negative for hip pain.  In a prone position the patient did not have significant pain to palpation and no significant muscle spasm.

IMPRESSION:  Chronic low back pain in a setting of bilateral facet arthropathy.  There is no evidence for spinal cord injury or nerve root impingement.

REHABILITATION RECOMMENDATIONS:
1. I would support a total disability from the perspective of work as this patient does have chronic pain, has given a good effort at work throughout her life and despite that is unable to tolerate a full work day which would include both sitting and standing.
2. Unfortunately, she did not tolerate Vioxx, and Celebrex has been fairly ineffective for her in the past.
3. A course of acupuncture may provide some **short-term** pain relief.

Tr. 180-181(emphasis added).  On that same day, Dr. Schwartz prescribed acupuncture for 6-8

sessions.  Tr. 182.

On **April 25, 2001**, Alston Lundgren, M.D., evaluated Herrera at Dr. Schwartz' request.

Tr. 251.  As previously noted, Dr. Schwartz prescribed acupuncture for Herrera's back pain. Tr.

182. Dr. Lundgren took an extensive history and performed a physical examination.  Dr.

15

Lundgren noted Herrera had a 20% permanent disability.  Herrera reported she had pain on a daily basis and rated the pain 7 or 8 on a 10 point scale.  Herrera also reported there was no position in which she was pain free, experiencing pain sitting, standing, and lying down.  Herrera reported having to get up and move around to reduce the pain and complained she was unemployed because "it hurts too much to work."  *Id.*  The physical examination revealed she was able to side bend 10 degrees to the left and 20 degrees to the right, rotate 90 degrees bilaterally, and bend forward and touch to 14 inches from the floor.  Dr. Lundgren noted tenderness to palpation on the PSIS (posterior superior iliac spine), both sides, and tenderness of the L 2, 3, 4 interspaces.  The straight leg raise was negative in both sitting and recumbent position.  Knee and ankle reflexes were symmetric and within normal limits.  Dr. Lundgren assessed Herrera as having "spinal enthesopathy/lumbar[2] myelopathy[3] by history and report of imaging."  *Id.*  Dr. Lundgren treated Herrera with acupuncture.

On **May 9, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 252.  Herrera complained of low back pain.  Herrera reported "she was free from the lateral pelvic brim and sciatic discomfort for one day and then it returned."  *Id.*  However, her central back pain continued.  The examination revealed she was not tender on palpation over lumbar interspaces but the sacral interspaces were "exquisitely tender."  *Id.*  Dr. Lundgren treated her with acupuncture.

On **May 15, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 252.  Herrera reported she had relief from her pain for about three hours.  It was difficult for her to lift her left leg, and she

---

[2] Enthesopathy is a disease process occurring at the site of insertion of muscle tendons and ligaments into bones or joint capsules. *Stedman's Medical Dictionary* 578 (26th ed. 1995).

[3] Myelopathy is a disorder of the spinal cord. *Stedman's Medical Dictionary* 1166 (26th ed. 1995).

16

complained of pain in both legs.  Herrera reported having difficulty sleeping and having pain down her legs bilaterally, and pain over her central and mid-back.  Dr. Lundgren noted tenderness in the lower thoracic and upper lumbar vertebrae.  Dr. Lundgren tried a different approach and "needled the sympathetic and parasympathetic point in the right ear."  *Id.*  This resulted in the disappearance of Herrera's pain.  Dr. Lundgren prescribed 800 mg of Ibuprofen three times a day.

On **May 17, 2001**, Herrera returned to see Dr. Lundgren and reported feeling better.  Tr. 252.  Her central pain was 85% resolved, her pelvic brim pain was 65% better, but she was still having some right sciatic pain.  Dr. Lundgren noted Herrera moved "gingerly," and the examination revealed tenderness in the lumbar interspaces.  Dr. Lundgren treated her with acupuncture.

On **May 22, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 252.  Herrera reported she was not taking any Ultram, Neurotin or Ibuprofen.  Herrera reported she still had pain down the interior lateral right thigh but her pain level was down about 60%, and she was sleeping better.  The examination revealed tenderness to palpation at L 2, 3, 4, and 5 interspaces.

On **May 31, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 253.  Herrera reported right lateral leg pain from her hip to her foot.  She reported she had felt better for one week after her last treatment until she vacuumed.  She was still feeling better than before her treatment.  The examination revealed tenderness over lumbar interspaces.  Dr. Lundgren treated her with acupuncture and instructed her not to vacuum.

On **June 4, 2001**, Dr. Lundgren sent a progress note to Dr. Schwartz.  Tr. 250.  Dr. Lundgren reported Herrera was responding nicely to treatment.  Dr. Lundgren indicated Herrera

17

had been 100% pain free for several days after her treatment.  Dr. Lundgren opined that the key

to Herrera's treatment was increasing the duration of relief.  Dr. Lundgren noted, "That will take

a number of further treatments, **6 more should get her good relief for at least a month is my**

**best guess**." *Id.*

On **June 7, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 252.  Herrera reported doing

well until that day.  Herrera could cross her legs, rise in the morning with little stiffness, and slept

better at night.  Dr. Lundgren treated her with acupuncture.

On **June 15, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 253.  Herrera reported she

was quite well and was restricting her activities.  She reported her right elbow was pain-free, her

energy level was good, and she was having a more restful sleep.

On **June 18, 2001**, Dr. Lundgren sent a progress report to Dr. Gleason.  Tr. 249.  Dr.

Lundgren informed Dr. Gleason that Herrera was getting "very good results and [was] happy."

*Id.*  Dr. Lundgren reported Herrera was sleeping much better.  Dr. Lundgren reported Herrera

was sleeping through the night and was not being awakened by the pain.  However, Dr. Lundgren

informed Dr. Gleason that Herrera had been on limited activities, for example, not pushing a

vacuum cleaner.  Dr. Lundgren recommended gradually increasing Herrera's activity to tolerance

depending on how she fared on the trip to Delaware.  Dr. Lundgren recommended six to ten more

treatments.

On **June 29, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 251.  Herrera reported she

had two good weeks, slept well, and her pain had been under good control.  On this visit, Herrera

reported pain in the lateral upper buttocks area, particularly on the right.  The examination

revealed mild tenderness to palpation at the superior lateral border of the pelvis and at the anterior superior iliac spine.  Dr. Lundgen treated Herrera with acupuncture.

On **July 16, 2001**, Herrera returned to see Dr. Schwartz.  Tr. 179.  Ed Grant, a physician assistant, took care of Herrera on that day.  Herrera reported the acupuncture had been the most "definitive treatment" she had received to date and requested additional sessions.  Mr. Grant examined Herrera and noted she could raise her legs bilaterally only to 40 degrees.  Mr. Grant directed Herrera to contact her Workers' Compensation representative and get approval for Dr. Schwartz prescribing more acupuncture sessions.  Mr. Gant also advised her to return to the clinic in six months.

On **July 20, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 251.  Herrera reported she had been well until July 13th.  She reported having a bad night.  Herrera complained of pain in her right elbow and her back.  The examination revealed tenderness to palpation around the waist at the pelvic brim and right leg from the pelvic brim down through the anterior thigh below the right patella.  Dr. Lundgren treated her with acupuncture.  On this visit, Herrera discussed changing doctors.  She was not happy that Dr. Gleason was not willing to perform surgery.  Dr. Lundgren suggested she consider Dr. Schwartz.  Dr. Lundgren also noted that, due to her long-standing injury, Herrera would not be cured but would need a treatment every two to three months.

On **August 9, 2001,** Herrera returned to see Dr. Lundgren.  Tr. 251.  Herrera reported having two weeks without pain.  Dr. Lundgren noted, "Patient appears moving fairly freely and does not show limp.  She is moderately tender to palpation on L2, 3, 4 interspace."  *Id.* (emphasis added).

On **September 6, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 248.  Herrera reported having back pain for the past three weeks.  Herrera reported the pain was intermittent and not as severe as it was before seeing Dr. Lundgren.  However, Herrera reported she "only had one week of good relief."  *Id.*  Herrera also reported her shoulders felt tight, her neck felt weak, and her head felt heavy.  Dr. Lundgren's examination indicated tenderness with palpation at the L5 interspace, the S1 interspace, less tenderness at the L2 interspace, pain in the lateral thighs, buttock and across the back.  Dr. Lundgren recommended some stretching exercises, treated her with acupuncture, and injected 0.4% dexamethsaone and 2% lidocaine at L2, 4, and 5 interspaces.  Dr. Lundgren directed Herrera to return in one month.

On **September 19, 2001**, Dr. Smith performed surgery on Herrera.  Tr. 206-209.  The preoperative diagnosis was chronic anal fissure, hypertrophied anal papilla. Tr. 206.  The surgery was uneventful.

On **October 15, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 248.  Herrera reported having some relief from her pain after her last treatment, but she was now hurting again.  It had been about six weeks since her last visit.  She had undergone a colonoscopy and polypectomy which had interfered with her acupuncture treatments.  At this time, Herrera reported her left elbow had been hurting.  Dr. Lundgren's examination revealed tenderness to palpation in L3, 4, 5 interspaces.  Additionally, both medical and lateral epicondyle on the left were tender to palpation.  Dr. Lundgren noted Herrera was walking "hunched forward a bit."   Herrera reported she felt pain at a level of 7 on a scale of 10.  Dr. Lundgren assessed her as having lumbar myelopathy secondary to industrial injury.  Dr. Lundgren treated her with acupuncture.  After

20

treatment, Herrera's pain "was down to barely perceptible discomfort in the left upper buttock PSIS." *Id.* Dr. Lundgren noted Herrera was able to get out of a chair quite comfortably.

On **October 25, 2001**, Herrera returned to see Dr. Lundgren. Tr. 248. Herrera reported a week of pain relief but gradually developed more discomfort, particularly down her right leg. The examination revealed <u>moderate tenderness at the L2, 3 and 4 interspaces</u>. Dr. Lundgren treated her with acupuncture.

On **November 8, 2001**, Herrera returned to see Dr. Lundgren. Tr. 248. Herrera reported having one good week of relief with subsequent pain. The examination revealed she was "quite tender to palpation on medical epicondyle on left and pain on resisted flexion of the wrist." *Id.* Dr. Lundgren treated Herrera with acupuncture.

On **November 12, 2001**, Herrera returned to see Dr. Lundgren. Tr. 247. Herrera reported she still hurt but was better after her last treatment. The examination revealed Herrera was "<u>quite tender to palpation over the lateral to midline at second intercostal interspace</u>." *Id.* (emphasis added). Dr. Lundgren treated her with acupuncture.

On **November 15, 2001**, Herrera returned to see Dr. Smith for a follow-up of her sigmoidoscopy, transanal excision rectal polyp, excision of a hypertrophied anal papilla and anal fissurectomy. Tr. 203. Herrera had no complaints on that day.

On **November 26, 2001**, Herrera returned to see Dr. Lundgren. Tr. 247. Herrera reported having a good week after treatment but reported the last six days she had difficulty sleeping because of her low back pain. The examination revealed tenderness on both medial and lateral epicondyle and tenderness at L 2, 3, and 4 interspace and in the paraspinous sacral region. Dr. Lundgren treated her with acupuncture.

On **December 3, 2001**, Herrera returned to see Dr. Lundgren.  Tr. 247.  Herrera reported she was in pain.  Dr. Lundgren noted Herrera "was considerably better until about 4 days ago." *Id.*  Dr. Lundgren noted Herrera was able to walk more comfortably and slept well except for the last three nights.  After acupuncture, Dr. Lundgren noted Herrera was "free of pain."  *Id.*

On **December 24, 2001**, Alston C. Lundgren, M.D., submitted a Medical Source Statement of Ability to Do Work-Related Activities.  Tr. 245.  Dr. Lundgren opined Herrera was limited in her ability to lift or carry 10 pounds occasionally and could not lift any weight frequently due to her lumbar myelopathy.  *Id.*  Dr. Lundgren also opined Herrera was limited in her ability to stand or walking to less than two hours due to her lumbar myelopathy and lateral epicondylitis.  Dr. Lundgren limited Herrera to four hours of sitting and totally limited her ability to do overhead reaching.  Tr. 246.  Finally, Dr. Lundgren opined Herrera was limited in her ability to do fine manipulation with hands/fingers.  As a basis for these limitations, Dr. Lundgren noted "pain, lateral epicondylitis, and failure as a phlebotomist."  *Id.*

On **January 29, 2002**, Dr. Lundgren evaluated Herrera. Tr. 242.  Dr. Lundgren noted Herrera complained of left elbow pain, "both lateral and medical epicondyle" for the last three months.  *Id.*  Herrera described the pain as a "10 on a scale of 10" and reported it was present all the time.  Herrera reported "it hurt to drive, inhibit[ed] her sleep," and "she [could not] hold a book up to read it."  *Id.*  Ibuprofen did not help the pain.  On examination, Dr. Lundgren found she was "tender to palpation on medial and lateral epicondyle, tender to palpation distally and proximally."  *Id.*  Dr. Lundgren treated Herrera with acupuncture.  After acupuncture, Dr. Lundgren noted,"she was pain free, and could extend and flex her elbow without difficulty and was pain free to palpation."  Tr. 243.  Dr. Lundgren also noted he had been treating Herrera's low

22

back pain with acupuncture and she had reported <u>two days of comfort after treatment</u>.  Tr. 242.

On **January 31, 2002**, Dr. Reeve, an agency consultant, evaluated Herrera. Tr. 211-214.

Dr. Reeve noted "low back pain" as the presenting complaint.  Tr. 211.  Herrera reported she

continued to have back pain and described it as constant and sharp.  Herrera reported activity,

bending, twisting, or reaching aggravated her pain.  Herrera also reported numbness and pain

radiating into the lower extremities bilaterally.  Tr. 212.  Dr. Reeve noted Herrera was

independent in driving, dressing, and in her activities of daily living.  Dr. Reeves examined Herrera

and noted:

> MUSCULOSKELETAL:  Cervical spine: flexion 40 degrees, extension 30 degrees, lateral
> flexion 20 degrees, rotation 45 degrees from the midline.  There was no evidence of spasm
> or guarding in the paraspinal muscles.  The reflexes are 2 plus at the biceps, triceps and
> wrist extensors.  Shoulder exam: abduction 180 degrees, flexion 180 degrees, extension 60
> degrees, external and internal 90 degrees.  There was a negative impingement maneuver.
> There was no evidence of pain with movement, and the reflexes at the biceps, triceps, and
> wrist extensors are normal.  Elbow exam: Flexion 150 degrees, extension to neutral,
> suppination 80 degrees, pronation 80 degrees, there was no evidence of pain to palpation
> over the elbow.  The patient had a negative Tinels sign over the elbow.  Wrist exam:
> Dorsiflexion 60 degrees, palmar flexion 70 degrees, radial deviation 20 degrees, ulnar
> deviation 30 degrees, there was no evidence of atrophy or wasting in the wrist or hand
> intrinsic.  The patient had 5/5 grip strength.  Lower extremities: the patient had full range
> of motion around lower extremities; there was no evidence of atrophy or wasting.  The
> patient leg lengths were grossly symmetrical.  The patient had normal pulses at the
> popliteal and femoral distribution.
> BACK:  70 degrees.
> FLEX:  20 degrees.
> EXT:  20 degrees.
> LATERAL FLEXION:  10 degrees.
> ROTATION:  20 degrees.
> STRAIGHT LEG RAISE:  negative bilaterally.
> PATRICK MANEUVER:  negative.
> TRIGGER POINTS:  negative.
> SKIN:  normal, scar on the right lower quadrant.

Tr. 213-214.  The neurological examination was essentially normal.  Dr. Reeve did not have

Herrera's x-rays available for review.  Dr. Reeve assessed Herrera with chronic back pain, history

of DJD (degenerative joint disease) and released her to light-duty.  Under "Vocational Status,"

Dr. Reeve noted: "At this time, clinically the patient is capable of performing activities at a light-

duty status which is within the range of a phlebotomist's activities.  The patient is capable [of]

performing these activities 8 hr. per day."  Tr. 214.  On the same day, Dr. Reeve ordered a three

view lumbar spine.  Tr. 216.  The x-rays indicated "[A] slight degenerative disc narrowing at L4-

5.  The remainder of the disc spaces are normal.  Posterior alignment is anatomic.  Mild

osteophytic lipping of the vertebral body is seen anteriorly."  *Id.*

On **February 11, 2002**, Herrera returned to see Dr. Lundgren.  Tr. 242.  Herrera

continued to complain of left elbow pain.  She reported the pain continued to be a 10 on a scale of

ten and the best it felt was an 8.  Herrera reported she could not hold a telephone in her left arm.

Additionally, Herrera reported her back was hurting and reported the pain was also 10 on a scale

of 10.  However, Herrera reported the pain was not a 10 every day.  Herrera reported the best her

back pain felt was a 4 on a scale of 10.  Dr. Lundgren's examination indicated  Herrera was very

tender to palpation on medial epicondyle of left elbow, tender to palpation from 6" proximally and

distally, and tender to palpation on lumbar interspaces.  Dr. Lundgren assessed Herrera with

medial epicondylitis, arm pain and LBP (lower back pain).  Dr. Lundgren treated Herrera with

acupuncture.  After treatment, Herrera could extend her left arm, hold a telephone and reported

no pain.  Herrera also reported "very minimal pain in her low back pain and was able to sit and

rise from a chair, cross legs, etc."  *Id.*

On **March 6, 2002**, Dr. Nancy Nickerson, a non-examining agency consultant, completed

a "Physical Residual Functional Capacity Assessment" form.  Tr. 218-225.  Dr. Nickerson opined

Herrera could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for a total

of 6 hours in an 8-hour workday, sit for a total of 6 hours in an 8-hour workday, and push and/or pull (including operation of hand and/or feet) unlimited.  Tr. 219.  Dr. Nickerson noted: Claimant's chronic low back pain has been refractory to both conventional conservative medical treatment and unconventional conservative treatment (acupuncture) for the past few years. Imaging has reported DDD (degenerative disc disease) at L4-5, L5-S1.  There is no evidence of HNP (herniated nucleus pulposus) or lumbar radiculopathy."  Tr. 223.

On **April 22, 2002**, Herrera returned to see Dr. Lundgren.  Tr. 242.  Herrera reported her left elbow had been well until that day.  She was now "hurting on the medial epicondyle site and very minimally proximally and distally."  *Id.*  Herrera also was complaining of back pain.  Dr. Lundgren's examination revealed tenderness on palpation of the medial epicondyle.  Dr. Lundgren assessed Herrera with medial epicondylitis and treated her with acupuncture which "totally eliminated her elbow pain."  *Id.*

On **July 2, 2002**, Herrera returned to see Dr. Lundgren.  Tr. 240.  Herrera complained of pain "over her pelvic brim on the backs of her thighs."  *Id.*  Herrera reported she was restless and having "fitful dreams."  *Id.*  Herrera reported she would be traveling to the east coast later that week and was dreading the long airplane trip.  Dr. Lundgren indicated Herrera moved stiffly and described her as moderately uncomfortable.  He noted she was "tender to palpation over L3, 4, 5 and some paraspinous muscles."  *Id.*  Dr. Lundgren treated Herrera with acupuncture.

On **July 15, 2002**, Herrera returned to see Dr. Lundgren and reported having a comfortable week despite traveling to the east coast.  Tr. 240.  However, Herrera reported that after one week she started hurting more severely and began experiencing left sciatica.  Because of the pain, Herrera was ready to undergo "deadening nerve roots with Sarapin and applying

percutaneous electric nerve stimulation." *Id.* Dr. Lundgren's examination revealed "tenderness in lumbar interspaces but exquisite pain in the left sacral foramen and left PSIS." *Id.* (emphasis added). Dr. Lundgren assessed Herrera with low back pain, left sciatica, and lumbar myelopathy secondary to old industrial injury. Dr. Lundgren "injected a mixture of 7cc of Sarapin (used in the treatment of sciatic pain) plus 3 cc of 2% lidocaine (anesthetic) plus 40 mg triamcinolone (steroid), 2cc in each of the left sacral foramen and 4 cc in the sacral notch on the sciatic nerve itself." *Id.* Dr. Lundgren directed Herrera to return in one week.

On **July 18, 2002**, Herrera returned to see Dr. Lundgren. Tr. 239. Herrera reported she had felt very well after her treatment. In fact, Herrera reported, "The day after treatment she felt the best she has in years, she was essentially totally pain free." *Id.* However, on that day, Herrera reported a small amount of low back pain but "small compared to pre-treatment." *Id.* Dr. Lundgren repeated the previous treatment.

On **July 29, 2002**, Herrera returned to see Dr. Lundgren. Tr. 239. Herrera reported several days of moderate discomfort with the last two days being more uncomfortable. Dr. Lundgren "injected Herrera with a mixture of Sarapin plus 0.6 % lidocaine at sacral foramen 1, 2 and 3 bilaterally, and also 5 cc in her R sciatic notch. Additionally, 1 cc at each level from T 8 through L5 bilaterally down to the transverse processes to block the sympathetic nerves in that area." *Id.* Significantly, Dr. Lundgren noted, "If after this treatment she does not recognize that we're making substantial progress towards improving her level of comfort, then I will revert to my previous acupuncture treatments." *Id.*

On **August 5, 2002**, Herrera returned to see Dr. Lundgren. Tr. 239. Dr. Lundgren noted, "after her last treatment she had two days of better relief than she usually has but is hurting

26

again." *Id.* (emphasis added).  Herrera informed Dr. Lundgren that she preferred not to continue the injection program.  At that time, Herrera reported pain from her left occiput and temple down to the lateral left ankle.  Dr. Lundgren assessed her as having low back pain and sciatica secondary to old industrial injury.  Dr. Lundgren elected to "revert to using Body Acupuncture plus Auricular Medicine . . . ." *Id.*  Dr. Lundgren recommended Herrera have this treatment every three weeks.

On **August 26, 2002**, Herrera returned to see Dr. Lundgren.  Tr. 238.  Herrera reported feeling better after her last treatment but was hurting again.  Herrera reported her left side was usually worse but the past month she had pain in both left and right sides at the same time or alternating.  Dr. Lundgren noted his tests indicated Herrera was "dealing with significant pain at that moment." *Id.* (emphasis added).  After acupuncture, Herrera had relief from her pain.

On **September 27, 2002**, Herrera returned to see Dr. Lundgren.  Tr. 238.  Herrera reported she "hurt a lot." *Id.*  Herrera reported "she had fairly good relief for one week, half relief for the second week, [but] the last 2 weeks had been bad." *Id.*  Herrera reported she could not sleep at night due to the pain in her low back, pain down the anterior and medial thighs, as well as lateral sciatica.  Herrera could not tolerate sitting for more than half an hour.  On examination, Dr. Lundgren found  she was "diffusely tender to palpation over most of her body." *Id.*  Dr. Lundgren treated Herrera with acupuncture.  At that time, Herrera asked Dr. Lundgren about the possibility of having two treatments per month for better relief from the pain.  Dr. Lundgren directed Herrera to contact her insurance.

On **October 28, 2002**, Herrera returned to see Dr. Lundgren.  Tr. 263.  Herrera reported having only three days of pain relief after last treatment.  Otherwise, she had been miserable since

her last visit.  Dr. Lundgren noted Herrera was having low back pain with lateral and anterior left leg pain.  The lateral sciatica radiated down to the ankle and the anterior left leg pain radiated to the knee. Dr. Lundgren injected Herrera with a combination of Serapin plus 0.6% lidocaine, plus 20 mg of triamcinolone in the sciatic notch and in the sciatic branch under the gluteal cleft.  Dr. Lundgren injected 4 cc of this solution in each site.

On **November 22, 2002**, Herrera returned to see Dr. Lundgren.  Tr. 262.  Herrera reported being in "a lot of pain."  *Id.*  The area of pain was central low back pain down both lateral legs and under the sacrum.  The examination revealed Herrera was "very tender to palpation at the 2nd and 4th lumbar interspace."  *Id.* (emphasis added).  Dr. Lundgren injected both sites with a solution of 1/10  of 1% triamcinolone in 2% lidocaine and also did acupuncture.  After her treatment, Herrera "got up, moved around and felt essentially zero pain."  *Id.*

On **December 23, 2002**, Herrera returned to see Dr. Lundgren.  Tr. 261.  Herrera reported she had about four days of fairly good relief from her pain after her last treatment.  However, she was now having a lot of pain in her back, shoulders, and knees.  She stated her pain was 4 on a 10 point scale.  She complained the shoulders were particularly painful.  Dr. Lundgren's examination revealed mild tenderness on palpation of all the lumbar interspaces.  Dr. Lundgren diagnosed Herrera with fibromyalgia, low back pain, and shoulder pain.  Dr. Lundgren injected both shoulders with a combination of Traumeel[4] and lidocaine.

---

[4] Traumeel is an anti-inflammatory, analgesic, anti-edematous anti-exudative combination formulation indicated for the treatment of symptoms associated with inflammatory, exudative, and degenerative processes due to acute trauma, repetitive or overuse injuries (such as epicondylitis), and for minor aches and pains associated with backache, muscular aches, and the minor pain from rheumatoid arthritis, osteoarthritis, gouty arthritis, and ankylosing spondylitis.  *Physicians Desk Reference* 1287 (53 ed. 1999).

On **December 31, 2002**, Herrera went to the Intermediate Care Center in Farmington, New Mexico.  Tr. 264.  Herrera complained of a rash on her left shoulder above her left breast. Herrera reported the rash was "painful at times."  *Id.*  The attending physician diagnosed the condition as "classic herpes zoster (shingles)" and treated it accordingly.  *Id.*

On **January 27, 2003,** Herrera returned to see Dr. Lundgren.  Tr. 261.  Herrera reported she was in pain one week after her last treatment.  Herrera complained of pain in both knees and both shoulders.  She had an outbreak of shingles in her left posterior shoulder going over to the anterior shoulder.  She reported her low back pain was now a 10 on a 10 point scale and complained of pain down both lateral and posterior legs.  The examination revealed knee tenderness over the medial and lateral joint lines, tenderness over her lumbar interstices, and tenderness on both PSIS's.  Dr. Lundgren assessed Herrera as having "LBP (low back pain) secondary to industrial injury, spinal enthesopathy and knee enthesopathy exacerbated by sciatica, and shingles."  *Id.*

## B.  Medical Opinion Evidence

"An ALJ is required to give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record."  *Drapeau v. Massanari*, 255  F.3d 1211, 1213 (10th Cir.2001); *see also* 20 C.F.R.  §§404.1527(d)(2). Moreover, the opinions of specialists related to their area of specialty are entitled to more weight than that of a physician who is not a specialist in the area involved.  *See* 20 C.F.R. § 404.1527(d)(5).

Unless good cause is shown to the contrary, the Commissioner must give substantial weight to the testimony of the claimant's treating physician.  If the opinion of the claimant's

physician is to be disregarded, specific legitimate reasons for this action must be set forth.  *Byron v. Heckler*, 742 F.2d 1232 (10th Cir. 1984).  "'In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.'"  *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)(quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)).  Moreover, an ALJ may not substitute his own opinion for medical opinion.  See *Sisco*, 10 F.3d at 744.  In his decision, the ALJ found:

> Ms. Herrera reportedly injured her back in 1983 and has since experienced lower back pain.  She was given an MRI in 1999.  This study disclosed relatively well maintained vertebral body height and disc spaces and no evidence of spondylolysis.  There was some asymmetry of the S1 joints but no acute abnormality.  Ms. Herrera's hips were also unremarkable (Exhibit 2F27).  In October 1999, Ms. Herrera underwent facet injections at L4-5 and L5-S1.  Her gait was described as within normal limits, and her motor strength and sensorium was intact (Exhibit 2F22).  A bone scan done in March 2000 yielded findings suggestive of facet arthropathy (Exhibit 2F20).  In April, Ms. Herrera underwent a facet injection and in May and June epidural blocks (Exhibits 2F13, 2F15, 2F17).  An MRI done in September 2000 showed no significant interval changes from the prior study.  Her condition was described as involving minimal degenerative changes (Exhibit 2F11).  A CT scan disclosed small disc protrusions at L2-3, L3-4, and L4-5 and a moderate anterilateral (sic) protrusion at L3-4.  No disc herniations or frank spinal stenosis was (sic) identified (Exhibit 2F9).  Ms. Herrera was given facet injections again in December 2000 which, in conjunction with Neurotin and Nortiptyline, significantly reduced her pain (Exhibit 2F1).  In February 2001 an Agency employee described Ms. Herrera as walking without a noticeable limp and sitting without apparent discomfort (Exhibit 2E).  That month treating physician P. Gleason M.D. reported that he could not comment on Ms. Herrera's disability status given the lack of dramatic anatomic abnormalities.  He referred Ms. Herrera to B. Schwartz, M.D.  In March 2001, Ms. Herrera was examined by Dr. Schwartz.  At this time, Ms. Herrera was reporting that her injection treatments did not significantly change her level of pain.  Upon examination, Ms. Herrera was in no acute distress; her posture was symmetric; she could heel and toe walk; squat and rise; and flex forward.  She had full strength; intact sensation and reflexes.  <u>Dr. Schwartz noted no evidence of spinal cord injury or nerve root impingement.  Somewhat inexplicably, based on this one examination Dr. Schwartz supported a total disability</u> and recommended she pursue acupuncture (Exhibit 3F3).  Ms. Herrera reported positive benefits from acupuncture treatments she received from A. Lundgren, M.D.  In June she was described as getting very good results and very happy (Exhibit 3F1, 10F12).  In October Ms.

Herrera was still reporting discomfort but indicated that it was markedly helped by the acupuncture treatments (Exhibit 5F1).  Despite what appears to be very successful results, in December 2001, Dr. Lundgren assessed significant exertional  and non-exertional limitations in a medical source statement (Exhibit 10F8-9).

In January 2002, Ms. Herrera was given a consultative examination by A. Reeve, M.D.  Dr. Reeve reported that Ms. Herrera was independent in driving; caring for her personal needs; and engaging in activities of daily living.  X-rays showed slight L4-5 disc space narrowing.  After a physical and neurological examination, Dr. Reeve considered Ms. Herrera as capable of performing activities at a light duty status within the range of her past occupation as a phlebotomist.  Dr. Reeve considered her capable of performing such activities for eight hours per day (Exhibit 7F).

Ms. Herrera testified that she was in constant pain from her neck down, including her shoulders, elbows, knees and legs.  She said that her acupuncture treatments only helped a little.  Ms. Herrera estimated that she could only sit ten to twenty minutes; stand twenty minutes; and could lift no more than five pound.  Ms. Herrera said that she required help with her personal needs due to problems with her hands and only slept four hours per night.  She stated that she could not sit, stand, or walk around her home (testimony).

The objective findings in this case do not support the level of subjective complaints and functional limitations Ms. Herrera has asserted.  She has what must be considered potentially pain-producing impairments; takes only ibuprofen; but as noted by Dr. Gleason, has no truly significant anatomic abnormalities.  Ms. Herrera has not required aggressive medical intervention such as surgery and there is no evidence of any spinal cord or nerve root impingement.  I therefore cannot fully credit her contention that she leads an impoverished and basically helpless lifestyle.  I have particular difficulty reconciling the level of functionality she related to Dr. Reeve with that presented at the hearing.  For much the same reasons, I also afford little evidentiary weight to the opinions of Drs. Schwartz and Lundren (sic).  There is a reference to fibromyalgia in the record but observations regarding the requisite trigger points are not documented.  Ms. Herrera's examinations have not revealed clinical signs or laboratory findings which support the level of impairment she alleges.  Medically determinable impairments related to her complaints of joint pain have not been identified.  Normally, treating physician opinions are afforded substantial evidentiary weight, but only when they are backed up by objective findings.  In the present case, they are not.  As such, I consider Dr. Reeve's opinion most reflective of Ms. Herrera's condition and her overall residual functional abilities.  I therefore adopt Dr. Reeve's opinion, and find that Ms. Herrera retains a residual functional capacity for the performance of "light" work.

Tr. 18-19 (emphasis added).

Herrera contends the ALJ did not properly weigh Dr. Lundgren's treating source medical

opinion.  Pl.'s Mem. in Supp. of Mot. to Reverse at 15.  Herrera argues Dr. Lundgren "assessed

significant reaching and handling limitations in the RFC he prepared for DDS." *Id.*  Herrera

contends the ALJ failed to consider the effects of her upper extremity impairments in violation of

Social Security Ruling 96-8p. *Id.*

As previously noted, on December 24, 2001, Alston C. Lundgren, M.D., a treating

physician, completed a Medical Source Statement of Ability to do Work-Related Activities form.

Tr. 245-246.  Dr. Lundgren opined Herrera was limited in her ability to lift and carry and could

only occasionally (up to 1/3 of the day) lift 10 pounds and could not carry <u>any</u> weight frequently.

Tr. 245.  Dr. Lundgren based his opinion on Herrera's "lumber myelopathy." *Id.*  Dr. Lundgren

also opined Herrera was limited in her ability to stand and walk and could stand and/or walk less

than two hours.  *Id.*  Dr. Lundgren based this limitation on Herrera's lumbar myelopathy and

lateral epicondylitis (inflammation of the lateral epicondyle of the humerus).  Significantly, Dr.

Lundgren noted Herrera was "totally" limited from overhead reaching, limited in handling objects,

and limited in fine manipulation with her hands and fingers.  Tr. 246.  Dr. Lundgren based this

limitation on Herrera's complaints of pain, lateral epicondylitis and her failure as a phlebotomist.

*Id.*

A review of the medical record indicates Herrera first saw Dr. Lundgren on February 8,

2001, with complaints of right elbow pain.  Tr. 243.   Herrera reported her right elbow had been

hurting since October 2000.  Herrera described the pain as continuous, 24/7, even at rest.  The

pain interfered with Herrera's sleep.  Dr. Lundgren treated Herrera's right elbow with

acupuncture.  After treatment, Herrera reported she could move her right elbow without pain.  On

February 15, 2001, Herrera reported she no longer had right elbow pain, complaining only of

discomfort the past two nights prior to this visit.  On February 22, 2001, Herrera returned to see

Dr. Lundgren.  Tr. 243.  Herrera reported her right elbow was pain-free.  On March 7, 2001, Herrera reported she had been pain-free for one week.  On June 15, 2001, Dr. Lundgren noted, "Incidentally, her right elbow is also pain-free."  Tr. 253.  On July 20, 2001, Dr. Lundgren noted, "Also, her R elbow is beginning to hurt again." Tr. 251.

On October 15, 2001, Dr. Lundgren noted, "Additionally, her L elbow has been acting up."  Tr. 248.  Dr. Lundgren noted, "Both medial and lateral epicondyle on the left are tender to palpation."  *Id.*  Dr. Lundgren treated Herrera's left elbow with acupuncture which eliminated her lateral epicondylitis.  However, the medial epicondylitis persisted, so Dr. Lundgren treated Herrera with additional acupuncture, totally eliminating her lateral epicondylitis.  *Id.*  On November 8, 2001, Dr. Lundgren examined Herrera and noted, "She also is quite tender to palpation on medial epicondyle on left and has pain on resisted flexion of wrist.  This is not true on resisted extension of wrist and she's not tender on lateral epicondyle."  *Id.*  Dr. Lundgren diagnosed Herrera with medial epicondylitis on left.  On November 26, 2001, Herrera complained of pain of her left elbow.  Tr. 247.  Dr. Lundgren noted she was "very tender on both medial and lateral epicondyle."  *Id.*  After acupuncture, Dr. Lundgren noted both lateral and medial epicondyle were pain-free.  On December 24, 2001, Dr. Lundgren submitted his Medical Source Statement of Ability To Do Work-Related Activities and restricted Herrera from overhead reaching because of pain from the  lateral epicondylitis.  On January 29, 2002, Dr. Lundgren evaluated Herrera at Dr. McCormick's request.  Tr. 242.  Herrera was complaining of left elbow pain.  Herrera reported having left elbow pain for three months.  Dr. Lundgren noted:

> Pain extends upward in upper arm and downward in forearm, about half way each.  It's there all the time, 10 on a scale of 10.  She had no specific trauma.  It hurts to drive, inhibits her sleep, she can't hold a book up to read it.  She's taken Ibuprofen without help.

> The R elbow pain that she had had last year resolved with my treatments and has been
> absent ever since.

*Id.*  On February 11, 2002, Herrera returned to see Dr. Lundgren for her left elbow pain.  Tr. 242.

Herrera reported she had pain on the medial epicondyle.  Herrera reported the pain reached a 10

on a 10 point scale.  Dr. Lundgren's examination revealed tenderness over the left medial

epicondyle.   After acupuncture, Herrera could extend her left arm, hold telephone, and stated she

had no left elbow pain.  On April 22, 2002, Herrera returned to see Dr. Lundgen for a recurrence

of her left elbow pain.  Tr. 242.   The examination revealed tenderness over the left medial

epicondyle.  After acupuncture, Herrera reported her pain was totally eliminated.

    In his decision, the ALJ failed to discuss Herrera's left medial epicondylitis.  From Dr.

Lundgren's medical notes, it appears that Herrera's problem with her right elbow was resolved.

However, in April 2002, Herrera was still having problems with pain from her left medial

epicondylitis.   On remand, the ALJ should consult Dr. Lundgren regarding this impairment.  If

Herrera continues to suffer from left medial epicondylitis, the ALJ should consider this

impairment and any resulting limitations along with her other impairments, whether severe or

nonsevere in redetermining her RFC.  *See* SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996)(in

assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an

individual's impairments, even those that are not severe).

    Herrera also contends the ALJ accorded "little evidentiary weight" to Dr. Schwartz'

disability opinion but failed to assess the medical opinion evidence in accordance with the

Commissioner's ruling and regulations, and Tenth Circuit caselaw."  Pl.'s Mem. in Supp. of Mot.

to Reverse at 19.  Herrera claims the ALJ failed to give legitimate reasons for rejecting Dr.

Schwartz' opinion and failed to acknowledge (1) Dr. Schwartz' examination findings of severe

pain with movement and positive bilateral straight leg raise; and (2) Herrera's bilateral facet arthritis.

Dr. Schwartz recorded "straight leg raises are 80 degrees bilaterally," and also found "no evidence for spinal cord injury or nerve root impingement."  Tr. 180-181.  Significantly, Dr. Schwartz was very specific in her diagnosis noting, "Chronic low back pain in a setting of bilateral facet arthropathy."  Tr.181.  Dr. Schwartz reviewed Herrera's medical records and based her diagnosis on those records and her evaluation.  Based on Dr. Schwartz' diagnosis, Herrera could have positive leg raises in the absence of nerve root impingement.  The record indicates, in pertinent part, that on (1) on July 23, 1999, Herrera's lumbar MRI indicated "facet arthropathy" at L4-5 (Tr. 173); (2) on October 15, 1999, Dr. Hinds, an orthopedic surgeon, diagnosed Herrera with "mechanical low back pain with facet arthropathy" and administered bilateral facet injections at L4-5, L5-S1 (Tr. 172-174); and (3) on March 21, 2000, Herrera had a whole body bone scan (Tr. 170) which indicated "abnormal uptake on the right and lower spine, likely involving the posterior elements, probably along the facet joint at either the L3-L4 or L4-L5 level," suggestive of facet arthropathy.  Tr. 171.   Dr. Schwartz' examination also revealed "fairly severe pain" with "flexing backwards" and back pain, worse on the left, with extension and rotation.  Tr. 181.

The record indicates Herrera suffered from lumbar facet arthropathy.  This condition is not characterized by the usual clinical and radiological findings found in osteoarthritis. *The Merck Manual* 477 (17th ed. 1999).  Facet arthropathy is characterized by associated nerve root irritation findings.  *Id.*  This would account for Herrera's complaints.  In fact, as found by Dr. Schwartz during her examination, "[h]yperextension usually aggravates pain derived from posterior facet joints."  *Id.*  Additionally, the ALJ ignored objective clinical evidence supporting

35

Herrera's complaints of pain.  *See, e.g.*, Tr. 150 (physical examination revealed (1) marked bilateral paraspinal muscle spasm, (2) straight leg raise is positive on the right and left sides, (3) extension is limited essentially to the neutral position by pain); Tr. 171-172 (physical examination revealed (1) decreased sensation over left toe and (2) tenderness to palpation paraspinally in the lower lumbar area); Tr. 154 (tenderness over SI joints to palpation, flexion at the waist at about 45 degrees precipitated pain, extension at about 15 degrees precipitated pain); Tr. 243 ("tenderness to palpation at C5-6-7 interspaces, S 19 and Th 14 and 15"); Tr. 180 (fairly severe pain with flexing backwards, extension and rotation precipitated back pain, worse to the left); Tr. 251 ("tenderness to palpation on the PSIS, both sides, and tenderness of the L 2,3, 4 interspaces"); Tr. 252 (physical examination revealed sacral interspaces were "exquisitely tender"); Tr. 252 (tenderness in the lower thoracic and upper lumbar vertebrae); Tr. 252 (examination revealed tenderness in the lumbar interspaces); Tr. 253 (examination revealed tenderness in the lumbar interspaces); Tr. 251 (examination revealed tenderness to palpation around the waist at the pelvic brim and right leg from the pelvis brim down through the anterior thigh below the right patella).

The ALJ failed to give legitimate reasons for rejecting Drs. Schwartz' and Lundgren's medical opinions.   The ALJ disregarded Drs. Lundgren's and Schwartz' medical opinions on the basis that (1) Herrera "has not required <u>aggressive</u> medical intervention such as surgery;" (2) Herrera "takes only Ibuprofen;" (3) "there is no evidence of any spinal cord or nerve root impingement;" (4) "Herrera's examinations have not revealed clinical signs or laboratory findings which support the level of impairment she alleges;" and (5) "[m]edically determinable impairments related to her complaints of joint pain have not been identified."   Tr. 19.

36

The Court has already discussed Herrera's diagnosis of lumbar facet arthropathy as the basis for her complaints; thus, the record does not support the ALJ's reasons Nos. 3, 4, and 5. Surgical intervention was not indicated or recommended by any of Herrera's treating physicians. In fact, Herrera "was not happy that Dr. Gleason was not willing to perform surgery." Tr. 251. Thus, the ALJ cannot use this as a reason to reject her physicians' opinions. Moreover, the facet and epidural steroid injections were aggressive enough treatment. This required quite an extensive and unpleasant procedure. *See e.g.*, Tr. 164-165, 172-174. Herrera endured several of these facet and epidural steroid injections. It is doubtful that an individual would subject themselves to such an extreme procedure if they were not in pain.

Finally, a review of Dr. Lundgren's clinical notes also indicate Herrera was very consistent in receiving treatment for her pain. In fact, on September 27, 2002, Herrera asked Dr. Lundgren about the possibility of receiving two treatments per month for better relief of her pain. Tr. 263. Dr. Lundgren also prescribed injections for Herrera's pain along with acupuncture. Thus, the ALJ's statement that Herrera only took Ibuprofen for her pain is not accurate. The Court will remand this matter to allow the ALJ to reconsider Drs. Schwartz' and Lundgren's medial opinions in light of Herrera's diagnosis of lumbar facet athropathy. The ALJ should seek clarification from Herrera's physicians as to the limitations Herrera may have as a result of this impairment. Additionally, the ALJ should consult Dr. Lundgren regarding Herrera's left medial epicondylitis.

## C.  Credibility Determination

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence. *Diaz v. Secretary of Health and Human Servs.*,

898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  The ALJ need only set forth the specific evidence he relies on in evaluating claimant's credibility.  *Id.*  The ALJ may also consider his personal observations of the claimant in his overall evaluation of the claimant's credibility.  *Id.*

In evaluating a claimant's credibility regarding pain, the ALJ must consider the level of medication the claimant uses and its effectiveness, the claimant's attempts to obtain relief, the frequency of medical contacts, the claimant's daily activities, subjective measures of the claimant's credibility, and the consistency or compatibility of nonmedical testimony with objective medical evidence.  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir 1995).

The ALJ found Herrera not credible for the same reasons he disregarded her physicians' opinions and because he had "particular difficulty reconciling the level of functionality she related to Dr. Reeve with that presented at the hearing."  Tr. 19. .

The ALJ's credibility finding is not supported by substantial evidence.  As previously noted, Herrera's physicians diagnosed her with lumbar facet arthropathy which would support her complaints of back pain.  Additionally, a review of the record indicates Herrera was consistent in reporting when she experienced a decrease in her pain after treatment, whether by injections or by acupuncture.  Typically, Herrera had a period of decreased pain and at times was pain-free after treatment.  However, the duration of relief varied from a few days to a couple of weeks.  When Dr. Reeve evaluated Herrera, it had only been two days since Dr. Lundgren had treated her for

her left elbow and lower back.  Herrera also has a long work history and continued to work after her back injury in 1983 and for a significant period of time after she started experiencing increased pain.  The ALJ also failed to consider Herrera's attempts to relieve her pain.  On remand, the ALJ should redetermine Herrera's credibility.

## D.  Conclusion

Based on the record as a whole, the ALJ erred in the weight he accorded Herrera's physicians' opinions and his RFC assessment is not supported by substantial evidence and is contrary to law.  On remand, the ALJ should consult Drs. Schwartz, Lundgren, and Hinds regarding (1) Herrera's diagnosis of lumbar facet arthropathy; (2) the limitations that Herrera may experience as a result of lumbar facet arthropathy, e.g., the need to alternate sitting and standing to accommodate her pain; and (3) whether those limitations would, in their opinions, be disabling. The ALJ also should consult Dr. Lundgren regarding Herrera's left medial epicondylitis and any restrictions or limitations that may result from that impairment.   The ALJ should redetermine Herrera's RFC pursuant to Social Security Ruling 96-8p and redetermine her credibility.  The ALJ also may consider whether it would assist him in his RFC determination to have Dr. Schwartz complete a Physical Residual Functional Assessment form.  However, the Court expresses no opinion as to the extent of any impairment, or whether Herrera is or is not disabled within the meaning of the Social Security Act.   The Court does not require any result.  This remand simply assures that the ALJ applies the correct legal standards in reaching a decision based on the facts of the case.

A judgment in accordance with this Memorandum Opinion and Order will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**